IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TOMBSTONE EXPLORATION CORP.,<br><br>    Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>EUROGAS, INC.,<br><br>    Defendant, Counterclaim Plaintiff and Third-Party Plaintiff,<br><br>RIATA MINERALS INC., WOLFGANG RAUBALL, and JACK BAUSKA,<br><br>    Defendants,<br><br>v.<br><br>ALAN M. BROWN,<br><br>    Third-Party Defendant. | **MEMORANDUM DECISION AND ORDER CONSTRUING AGREEMENTS**<br><br>Case No. 2:15-cv-00195 DN<br><br>District Judge David Nuffer |

    This Memorandum Decision and Order construes and interprets four key documents which are the foundation of many claims in the case, dealing with the material terms. The Memorandum Decision and Order was provided in draft before trial to assist the parties in presentation of proof. Following the findings of fact entered March 21, 2018, it was again provided as a basis for the eventual decision. After the conclusions of law were announced March 22, 2018, this order is entered.

FACTS AND DOCUMENTS .................................................................................................... 2
DISCUSSION ...................................................................................................................... 3
    The Agreement .............................................................................................................. 3
    The First Amendment .................................................................................................... 5
    The Second Amendment ............................................................................................... 5
    The Extension Agreement ............................................................................................. 7
    No Need to Consider Extrinsic Evidence ...................................................................... 9
    Summary of Parties' Obligations Under the Agreements ........................................... 10

## FACTS AND DOCUMENTS

The parties have stipulated to the existence, execution and authenticity of four significant documents and to some pertinent facts.[1]

1.  On December 13, 2013, EuroGas, Inc., ("Eurogas"); Eurogas AG, and Tombstone Exploration Company ("Tombstone") entered into a Stock-for-Stock Exchange Agreement ("Agreement"). A true and correct copy of the Agreement is Joint Exhibit 3.

2.  On January 13, 2014, the parties entered into a First Amendment to the Agreement (the "First Amendment"). A true and correct copy of the First Amendment is Joint Exhibit 4. The First Amendment re-affirmed the original Agreement but added that EuroGas granted to Tombstone an amount equal to 20% of any award obtained by EuroGas or EuroGas AG, an indirect subsidiary, relating to EuroGas's lawsuit against the Slovak Republic in Paris, France.

3.  On May 13, 2014, EuroGas and Tombstone entered into a Second Amendment to the Exchange Agreement (the "Second Amendment"). A true and correct copy of the Second Amendment is Joint Exhibit 8.

---

[1] Statement of Undisputed Facts is Joint Exhibit 1 The Pretrial Order also contains the stipulations, docket no. 117, filed March 16, 2018. This order attempts to correct errors in the designation of exhibit numbers in some documents.

4.  On May 20, 2014, pursuant to the Second Amendment, EuroGas's Utah counsel wired $100,000 to Tombstone and received a certificate representing 69 million shares of Tombstone stock from Tombstone's transfer agent. The certificate representing the 69 million shares was agreed by the parties to be issued in the name of ZB Capital AG, a EuroGas subsidiary.

5.  In August 2014, Tombstone filed a lawsuit in the federal district court of Utah against EuroGas and others. The Complaint was denominated as Tombstone v. EuroGas, et al., Case No. 2:14-cv-00606-PMW. A true and correct copy of the Complaint is Joint Exhibit 18.

6.  On November 19, 2014, EuroGas and Tombstone (along with EuroGas AG and ZB Capital AG) entered into an Extention Agreement [sic] (the "Extension Agreement"). The Extension Agreement re-affirmed the original Agreement, as amended, but added new provisions. A true and correct copy of the Extension Agreement is Joint Exhibit 20.

7.  Tombstone voluntarily dismissed Case No. 2:14-cv-00606 without prejudice on November 25, 2014.

## DISCUSSION

**The Agreement**

The Agreement effective December 10, 2013, calls for exchange of stock and payment of money. In the exchange of stock, Tombstone was to deliver 348 million shares of its stock to Eurogas while Tombstone was to receive 240 million shares of Eurogas AG, an indirect subsidiary of Eurogas. The 240 million Eurogas AG shares were recited as 26% of the Eurogas AG issued and outstanding shares. The parties have stated, though the documents do not state, that the 348 million shares of Tombstone stock were to give Eurogas control of Tombstone.

Eurogas was to have "the right to appoint two Members" to the Tombstone Board and Tombstone was to have the rights to appoint two members to the board of Eurogas AG.

Closing under the Agreement was to occur December 10, 2013. Eurogas was to pay for exploration work by Tombstone, with "$500,000 on closing; $500,000 on or before April 30, 2014, and $4,000,000 on or before September 30, 2014." The Agreement contains many covenants and conditions.

The Agreement refers to the Eurogas AG shares of common stock as the "Shares."

> Seller is willing to exchange 240 million shares (the "Shares") of [Eurogas AG] common stock (the "Shares") representing approximately 26% of [Eurogas AG]'s total issued and outstanding shares of Common Stock for common stock of [Tombstone].

The Agreement also contains a merger clause:

> 14. Miscellaneous.
>    d. <u>Entire Agreement</u>. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related [sic] in any way to the subject matter hereof.

and a clause regarding amendments:

> j. <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by [Tombstone] and [Eurogas] or their respective representatives. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

and a severability clause:

> k. <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**The First Amendment**

The First Amendment dated January 13, 2014, modified the Agreement to require Eurogas to "grant [Tombstone] an amount equal to twenty percent (20%) of any award granted to [Eurogas] or [Eurogas AG] relating to the certain lawsuit filed by [Eurogas AG] and [Eurogas] against the Slovak Republic, such amount shall be tendered to [Tombstone] in cash within 5 days of receipt of the same by either the [Eurogas AG] or [Eurogas]."

The First Amendment also reaffirmed the Agreement.

> 3. <u>Full Force and Effect of Other Terms</u>. The Parties hereby confirm that all other terms and conditions of the Original Exchange Agreement are in full force and effect and are un-amended except as expressly provided in this First Amendment.

The First Amendment did not change the closing date, which had passed a month earlier.

**The Second Amendment**

The Second Amendment effective "as of the 13th of May, 2014" recites that "the Parties desire to amend, modify, and otherwise revise the Original Exchange Agreement and the First Amendment . . . ." The Second Amendment makes significant changes to the parties' prior agreements. The Second Amendment

- calls for Eurogas to receive a stock certificate for 69 million Tombstone shares upon payment by Eurogas to Tombstone of $100,000;

- calls for[2] Eurogas to transfer "the [Eurogas AG] Shares"[3] and "remit payment in the amount of $400,000" to [Tombstones's lawyers] via wire transfer on June 13,

---

[2] The actual text of this provision, with all defined terms is:

> Seller shall also transfer the Shares and remit payment in the amount of $400,0000 to Purchaser's attorneys, WALLIN HESTER, PLC, via sire transfer on or before June 13, 2014, in exchange for receipt of additional 279,000,000 restricted shares of Purchaser's stock (the "Restricted Shares"), which Purchaser shall immediately transfer to Seller upon receipt of the Shares and the $400,000 payment.

[3] Because no definitions from the Agreement were amended in the First or Second Amendment, this reference is to the Eurogas AG shares as defined in the Agreement.

5

2014, "in exchange for receipt of additional 279,000,000 restricted shares of [Tombstone's] stock (the 'Restricted Shares')[4]";

- changes the closing date to May 13, 2014; and

- changes other payment dates to later dates:

   In addition to the other payments set forth . . . , [Eurogas] shall also remit the following payments to [Tombstone]:
   i.   $500,000 on or before August 30, 2014 and
   ii.  $4,000,000 on before October 31, 2014. The payments required under this paragraph shall be tendered to [Tombstone] in cash or its equivalent.

The Second Amendment also restates and expands the payment to Tombstone from the Slovak Republic case to include not only amounts awarded but also amounts received in settlement.[5]

The Second Amendment also dealt with the Mining Claims that had been held by Tombstone, but lost when the Eurogas check intended to pay the 2013 assessments had not cleared the bank.

   The Parties hereby amend the Agreement by inserting the following as Section 2(c):

   (b) [sic] Mining Claims. Seller and the company shall have Riatta Minerals deliver to Purchaser the two hundred sixty-one (261) mining claims (the "Mining Claims") currently held in Riatta Minerals' name and that were previously owned by Purchaser for the preceding seven (7) years, along with an executed and notarized quit claim deed transferring the Mining Claims to Purchaser, on or before May 13, 2014. Seller's and the Company's failure to have the Mining Claims timely delivered and transferred to Purchaser shall constitute a material breach of this Agreement.

---

[4] This is the first description of Tombstone's stock by the defined term "Restricted Shares" though the Agreement specifically stated they were "restricted shares."

[5]   In addition to the other consideration described in this Section 2(a), [Eurogas] shall pay [Tombstone] an amount equal to twenty percent (20%) of the total of any and all amounts awarded or received by [Eurogas] or [Eurogas AG], whether through judgment or settlement, relating to that certain lawsuit filed by [Eurogas] and the [sic] against the Slovak Republic. The payment(s) required under this paragraph shall be tendered to [Tombstone] in cash or its equivalent within five (5) days of the receipt of the monies by [Eurogas] or [Eurogas AG].

Finally, the Second amendment reaffirms the Agreement

    4.    <u>Other Terms and Conditions Remain</u>. The terms and conditions of this Second Amendment override and supersede any prior agreements between the Parties, and any prior agreements, including the Agreement, shall be deemed constructively amended as necessary to give full force and effect to this Second Amendment. Except as expressly set forth in this Second Agreement, the terms and conditions of the Agreement are otherwise unmodified, and remain in full force and effect. In the event of any inconsistency between the Agreement and this Second Amendment, the terms of this Second Amendment shall control. Each reference in the Agreement to its respective self shall be deemed also to refer to this Second Amendment.

**The Extension Agreement**

The Extension Agreement is the last amendment to the Agreement. It was "effective as of the 19th day of November 2014." It refers to the prior agreements, and the parties' "desire to reaffirm" them." It states:

    **6.**    **<u>Other Terms and Conditions of the Original Stock-For-Stock Exchange Purchase Agreement and its Amendments Remain the same.</u>** The terms and conditions of this Agreement override and supersede any prior agreements between the Parties as to dates for payments. Any prior agreements including the Stock-For-Stock Exchange Agreement, The First Amendment and the Second Amendment shall be deemed constructively amended as necessary to give full force and effect to this Agreement. Except as provided for in this Agreement, the terms, and conditions of the Stock-For-Stock Exchange Agreement, The First Amendment and the Second Amendment are otherwise unmodified, and reaffirmed and remain in full force and effect. In the event of any inconsistency between the Stock-For-Stock Exchange Agreements and this Agreement, the terms of this Extension Agreement shall control. The Parties hereby agree and acknowledge that the Stock-For-Stock Exchange Agreement and its Amendments are valid and binding and that good and valuable consideration has been exchanged between the Parties as it relates thereto.

The Extension Agreement used a new definition of "Shares"[6] to refer to "69,000,000 shares of Tombstone" that were issued on or about May 20, 2014 to "ZB Capital, A.G., a wholly owned subsidiary of Eurogas, Inc."

---

[6] WHEREAS, pursuant to the Second Amendment, on or about May 20, 2014, Tombstone issued 69,000,000 shares of Tombstone (the "Shares") to ZB Capital, A.G. a wholly owned subsidiary of Eurogas . . . .

The Extension Agreement provided for

- release of an opinion letter from Tombstone's lawyers related to the 69 million shares;

- authorization for transfer of the 69 million Tombstone shares;

- dismissal by Tombstone of *Tombstone v. EuroGas, et al.*, Case No. 2:14-cv-00606-PMW without prejudice;

- "payment of $400,000 to Tombstone on or before but no later than January 2, 2015" "[i]n consideration of Tombstone releasing the Shares and dismissing the Lawsuit without prejudice"; and

- revision of "the date by which the second remaining $4,500,000.00 payment will be due but…in no event will said date extend beyond 120 days from the Effective Date of this agreement."

The Extension Agreement thus eliminated one of the separate $500,000 payments and wrapped it into the final payment, which had been $4,000,000 for a total of a $4,500,000 payment. And the Extension Agreement changed dates, required dismissal of the lawsuit, and removed barriers to the issuance of the 69 million shares. Total dollars to be paid did not change.

The Extension Agreement does not discuss – and therefore does not affect – the prior agreements regarding the 240 million shares of Eurogas AG and the remaining 279 million shares of Tombstone due Eurogas. The statement that the $400,000 payment is made "[i]n consideration of Tombstone releasing the [69,000,000] Shares" does not mean that there is not other consideration for that payment. The Second Amendment defined the original consideration for the "payment in the amount of $400,000" and Eurogas's transfer of "the [Eurogas AG] Shares"[7] as "exchange for "receipt of additional 279,000,000 restricted shares of [Tombstone's] stock (the 'Restricted Shares').[8]"

---

[7] Because no definitions were amended, this reference is to the Eurogas AG shares.

[8] This is the first description of Tombstone's stock by the defined term "Restricted Shares" though the Agreement specifically stated they were "restricted shares."

**No Need to Consider Extrinsic Evidence**

There is no need to consider evidence extrinsic to the documents to determine the meaning derived below. While any agreement could be clearer in hindsight, and while the definition of "Shares" in the Extension Agreement varies from the definition of "Shares" in the Agreement, the documents are clear when carefully examined one by one.

Eurogas urges that extrinsic evidence should be considered:

> Because none of the amendments to the Agreement has an Integration Clause, Defendants should be allowed to testify as to their understanding of any amendments, not the least of which is the Extension Agreement.

In Utah, the application of the parol evidence rule is a "two-step process: 'First, the Court must determine whether the agreement is integrated. If the Court finds that the agreement is integrated, then parol evidence may be admitted only if the Court makes a subsequent determination that the language of the agreement is ambiguous.'"[9] "The parol evidence rule generally precludes the admission of 'evidence of contemporaneous conversations, representations, or statements offered for the purpose of varying or adding to the terms of an *integrated* contract.'"[10]

Paragraph 14 of the Agreement, which was reaffirmed in every amendment, including the Extension Agreement, precludes consideration of evidence outside the written documents:

> 14. Miscellaneous.
>     d. <u>Entire Agreement</u>. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related [sic] in any way to the subject matter hereof.

---

[9] See *Tangren Family Trust v. Tangren*, 182 P.3d 326, 330 (Utah 2008) (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1027 (Utah 1995)).

[10] *J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1109 (10th Cir. 2009) (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026 (Utah 1995), overruled on other grounds by *Tangren Family Trust v. Tangren, 182 P.3d 326 (Utah 2008)*).

and a clause regarding amendments:

> j. <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by [Tombstone] and [Eurogas] or their respective representatives. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

These parties created integrated agreements and specifically provided for their amendment by formal means only. There is no ambiguity in their language. No extrinsic evidence is admissible to determine or interpret the parties agreements.

**Summary of Parties' Obligations Under the Agreements**

As finally amended, the parties' obligations under the plain language of the agreements include the following:

- Tombstone transfers 69 million shares to Eurogas;

- Eurogas pays $100,000 to Tombstone;

- Eurogas and Eurogas AG have Riatta Minerals deliver the 261 Mining Claims, along with a Quit Claim Deed;

- Eurogas pays $400,000 to Tombstone by January 2, 2015, and is required to concurrently transfer the 240 million Eurogas AG Shares to Tombstone and upon receipt Tombstone is to immediately transfer the additional 279,000,000 restricted shares of Tombstone's stock;

- Tombstone and Eurogas exchange stock, with 279 million additional Tombstone shares being exchanged for 240 million Eurogas AG shares;

- Eurogas pays $4,500,000.00 to Tombstone no later than March 14, 2015.[11]

---

[11] https://www.convertunits.com/dates/from/Nov+14,+2014/to/Mar+14,+2015 (last visited March 16, 2018).

10

There are, of course, other obligations less material than these, and other fact and performance issues.

Dated March 23, 2018.

BY THE COURT:

_____
David Nuffer
United States District Judge